**J.R. MARRIOTT et al., d/b/a B & J Excavating, Petitioners,**

v.

**CITY OF DALLAS, Respondent.**

No. C-1277.

Supreme Court of Texas.

Jan. 5, 1983.

Rehearing Denied Feb. 9, 1983.

Carter, Jones, Magee, Rudberg & Mayes, John E. Agnew, Dallas, for petitioners.

Lee E. Holt, City Atty., Barry R. Knight, Asst. City Atty., Dallas, for respondent.

POPE, Chief Justice.

The City of Dallas sought and obtained a permanent injunction against J.R. Marriott, B.O. Marriott and the B & J Excavating Company. The trial court's decree enjoined the Marriotts and Excavating Company

from extracting stone, sand and gravel from their property inside the City limits without obtaining a specific use permit. The court of appeals, 635 S.W.2d 561, affirmed the trial court's judgment. We also affirm the judgment. The Marriotts contend that their property was temporarily zoned for agricultural uses in 1962 when the City annexed the area in which their property is located, and that the City's unreasonable delay for sixteen years in enacting a permanent zoning ordinance renders invalid the zoning for the property. We hold, as did the courts below, that the temporary zoning was later changed in 1965 to a permanent zoning and that the Marriotts had no special use permit for a mining operation even for a temporary agriculture zoning.

In 1962, the City of Dallas annexed territory including the thirty acre Marriott tract of land, zoning it as temporary residential. In 1965 the City enacted its Comprehensive Zoning Ordinance applicable to all of the lands in Dallas' City limits. The ordinance included textual materials accompanied with maps. The new 1965 ordinance changed the zoning on the Marriott tract from temporary residential. The Marriott tract appeared on the new map as "Temp A," a designation that meant temporary agricultural. The Marriotts urge that there was a sixteen year freeze which renders their land's zoning invalid and for that reason the tract is covered by no zoning at all. The City of Dallas says that zoning for the tract was changed in 1965 when it was zoned for agricultural use. This classification forbids mining for stone, sand and gravel without a specific use permit whether the zoning had been temporary or permanent.

The Marriotts purchased their property in June 1977. They contacted the City of Dallas about a specific use permit within two to three months after the purchase. They testified that an inspector told them they did not need such a permit, only a certifi-

cate of occupancy. They never obtained either a specific use permit or a certificate of occupancy. Shortly after taking possession of their land, the Marriotts purchased a drag-line and began removing earth, sand and gravel for the stated purposes of constructing ponds for a catfish farm. A catfish farm was a permitted use in an agricultural district but mining is forbidden. On August 22, 1978, the City of Dallas Action Center received a complaint concerning the operations on the Marriott property. On August 29, 1978, building inspector James Champion reported he found no violation at that time.[1]

Between 1977 and 1980 the Marriotts removed from the property 50,000 to 100,000 cubic yards of earth, sand and gravel that B.O. Marriott used as materials in his asphalt paving business. On February 3, 1981, the Marriotts contracted with B & J Excavating Company to complete the construction of the catfish ponds. The contract specified that the excavating would be done by B & J at no cost to Marriott Brothers, Inc. The apparent intent was that B & J would sell the materials mined from the property as their compensation for digging the ponds. Sand and gravel separating machinery and digging equipment were set up on the property, and B & J began hauling 50 to 75 truckloads from the property each day, five to six days per week. A pit was excavated twenty-one feet deep.

City of Dallas instituted this suit in April 1981 and after trial, the court supported its judgment with these findings of fact that relate to this appeal:

2. The Defendants have conducted and allowed to be conducted a stone, sand or gravel extraction use on the subject property. B & J Excavating, Inc. conducted the stone, sand or gravel extraction use for the Defendants and was subject to the Defendants' control.

---

1. Inspector Champion's report reads: "8–29–78. J.R. Marriott has application for Certificate of Occupancy for 'Catfish Farm,' a use deemed legal by the planning commission. Application taken 1/24/78 as 2978 Merlin Rd.

after Mr. Marriott purchased 20 [sic] acres of land from Mr. Stacey original applicant. No violation pt. C. Time of day of operation not a violation."

3. The portion of the subject property upon which the stone, sand or gravel extraction use has been conducted is zoned as an agricultural district as defined by the Comprehensive General Zoning Ordinance of the City of Dallas, Texas.

4. The agricultural district zoning on the subject property was properly established on March 29, 1965. Public hearings and notice as required by State law were given throughout the City to establish permanent zoning district classification for all property within the City of Dallas.

5. The City Council of the City of Dallas has not approved a Specific Use Permit to conduct the stone, sand or gravel extraction use on the subject property.

6. Defendants are causing irreparably [sic] harm to the subject property by injuring and disfiguring the subject property by the mining of stone, sand or gravel and adversely affecting the value of adjoining property.

7. The notation "Temp A" that appears on the official Zoning District Map as a zoning district classification for a portion of the subject tract was a drafting error by the staff of the Department of Urban Planning.

8. The reply on the City of Dallas Action Center Report dated September 12, 1978 only indicates that no violation of the zoning ordinance was observed on August 29, 1978.

Disregarding the evidence that is contrary to the findings and giving credence to the evidence which supports the findings, as we must, we hold that the findings are supported by some evidence. *Brown v. Frontier Theatres, Inc.*, 369 S.W.2d 299

(Tex.1963). *See also Wells v. Yarbrough*, 84 Tex. 660, 19 S.W. 865 (1892) and *Gulf, Colorado & Santa Fe Ry. Co. v. Fossett*, 66 Tex. 338, 1 S.W. 259 (1886).

According to the City's officials who testified, the violation was in the removal of the materials from the property. This removal process went beyond the mere construction of catfish ponds and became a large mining operation, with the catfish farm being secondary to the mining operation. The Marriotts' contract with B & J Excavating was to run for a five-year period, after the Marriotts' themselves had done extensive excavation between 1977 and 1980. The depth of the excavation went beyond that required for the catfish ponds, and B.O. Marriott himself testified that the work in progress could be fairly described as "a sand and gravel mining operation."

■ The Marriotts say that the "Temp A" designation on the map from 1965 to 1981, established as a matter of law a temporary holding or freeze upon their land use for sixteen years which is an unreasonable length of time and therefore invalid. *See Haynes v. City of Quanah*, 610 S.W.2d 842 (Tex.Civ.App.—Amarillo 1980, writ ref'd n.r.e.). There is evidence, however, of a change from the 1962 temporary zoning imposed upon newly annexed area. That is evidenced by the change in 1965 from the temporary residential zoning the land received in 1962. The trial court also found that the map designation as "Temp A" was a drafting error and that the Comprehensive Zoning Ordinance of 1965 permanently zoned the tract as agricultural. The finding is supported by the evidence. The testimony of Jim Self,[2] administrative assistant

2. Q. As you are aware from the testimony that we are concerned about, a piece of property about the 2800 block of Middlefield Road. Plaintiff's Exhibit 11 has been admitted into evidence to show a portion of that property. It shows the property to be zoned Temp A. I believe the shelf that goes directly to the right of that property is map key one which has also been admitted into evidence as Plaintiff's Exhibit No. 12.

Now, is it correct that these map sections match up on the lines so that you can go from one map to the next; it is intended to do that?
A. Yes.
Q. Now, if you will match up Plaintiff's Exhibit 11 and Plaintiff's 12 and see if those two match up there.
A. Yes, it appears to do so.
Q. Okay. On Exhibit P–11 it shows zoning on the corner of this property to be Temp A.
A. Yes, sir.
Q. And on Map P–11, [Map P–11 is the City's official number for Plaintiff's Exhibit

to the Board of Adjustment, explained that the draftsman made a mistake in joining two maps, so that one side of the map was correctly designated A, or agricultural, but that the adjacent map included a part of the same district which was marked "Temp A." This ambiguity on the map was resolved by the court's finding.

This "drafting error" is similar to that in *City of Hutchins v. Prasifka*, 450 S.W.2d 829 (Tex.1970). The City Council of the City of Hutchins passed a resolution to reclassify a tract of land from residential to manufacturing. Although the City Council never actually enacted the change, the reclassification was erroneously recorded on the zoning map in City Hall. A year later the City Secretary advised the Prasifkas that the map was correct and the Prasifkas purchased the property. They moved several items onto the property and poured a partial building foundation. This court held that neither the city's improper adoption of the resolution purportedly changing zoning, nor the alleged error on the zoning map, nor other circumstances estopped the city from enjoining the landowners from using their property, zoned residential, for heavy manufacturing. In *Prasifka* we said:

> [W]hile the method, or lack of it, of the City of Hutchins with regard to its zoning ordinances, regulations, and maps, leaves a great deal to be desired, the zoning laws of a city may not be changed by unauthorized resolution or by the unauthorized changing of zoning maps.

*Id.* at 836.

In the case now before us, the mistaken "Temp A" designation was also unauthorized, but it did not change the zoning laws of the City of Dallas.

■ The Marriotts also contend that the property continues to be temporarily zoned due to the language of Section 4–110 of the 1965 Comprehensive Zoning Ordinance. Each side interprets this section differently. Section 4–110 provides:

> There exists in certain fringe areas in the City of Dallas, land which is presently used for agricultural purpose and to which urban services are not yet available. These lands should appropriately continue to be used for agricultural purposes for a number of years and until needed for urban purposes in conformity with the orderly growth of the city. The uses permitted in the A, Agricultural District are intended to accommodate the normal farming, ranching and gardening activities. It is anticipated that all of the A, Agricultural District areas will be changed to other urban zoning categories as the area within the corporate limits of Dallas become further developed. Newly annexed territory shall be temporarily zoned as A, Agricultural District until permanent zoning is established.

Dallas, Tex. Comprehensive Zoning Ordinance 10962 § 4–110 (1965).

The Marriotts, looking to the last sentence of section 4–110, claim that the section establishes a temporary zoning classification for the agricultural districts described. The City of Dallas contends, and the courts below have held, that this provision provides permanent zoning for property previously annexed and now designated for agricultural uses. The last sentence of the section says that there will be a temporary classification for any property that is "newly annexed" in the future. In this case, however, the Marriotts' property was "newly annexed" in 1962. The conditions described in section 4–110 still existed in 1965 when the property was permanently zoned

12. It is not the same as Exhibit P–11.] which is the same zoning or district or area within the same line, it shows the zoning to be A.

Now, can you please explain how one map would be Temp A and the other map shows the area to be A?

A. Yes, in the graphics department, the draftsmen, ·the people that prepare these maps, were accustomed to preparing the maps prior to '65, which the residential—the temporary residential classification for an area such as this would be—a designation would have been applied. I assume they were thinking temporary residential and the new classification being agricultural, they were thinking temporary agricultural.

as agricultural, and it will continue with that zoning until change of conditions require an amendment to the ordinance.

Four witnesses testified that the property was permanently zoned Agricultural. They included Sam Harting, the assistant building official for the City; Joe Jackson, a zoning inspector with the City; Jim Self, the administrative assistant to the Board of Adjustment and also with the City's Urban Planning Department; and John Kimbrough, the zoning administrator with the City of Dallas Department of Urban Planning.

We conclude that section 4–110 provides for both a permanent zoning classification for agricultural uses that may be changed in the future and a temporary classification for newly annexed territory. We approve the interpretation of the City of Dallas. *Calvert v. Kadane,* 427 S.W. 605, 608 (Tex. 1968) and *Heard v. City of Dallas,* 456 S.W.2d 440, 443–44 (Tex.Civ.App.—Dallas 1970, writ ref'd n.r.e.). The Marriotts' property had been permanently zoned.

Since the zoning was permanent, the City's requirement that a specific use permit be obtained before such an operation begins is a reasonable one and it "has a substantial relationship to the public health, safety, morals or general welfare ..." *City of Waxahachie v. Watkins,* 154 Tex. 206, 212, 275 S.W.2d 477, 481 (1955). We find, therefore, that "no clear abuse of discretion is shown and the restriction must stand as a valid exercise of the city's police power." *Id.* *See also Nichols v. City of Dallas,* 347 S.W.2d 326 (Tex.Civ.App.—Dallas 1961, writ ref'd n.r.e.).

The Marriotts take issue with the trial court's finding that the inspector's report following the Action Center Complaint merely indicates that no violation was observed on that particular date. However, "[t]he fact that a city official or employee fails in certain particulars to enforce the regulation cannot render it invalid, nor estop the City from asserting its validity." *City of Corpus Christi v. Jones,* 144 S.W.2d 388, 392 (Tex.Civ.App.—San Antonio 1940, writ dism'd judgmt cor.), citing to *City of*

*Amarillo v. Stapf,* 129 Tex. 81, 87, 101 S.W.2d 229, 232 (1937).

The Marriotts also claim that there is no evidence to support a finding that the City of Dallas complied with the notice and hearing requirements mandated for permanent zoning. This is an attack upon the validity of the entire comprehensive zoning ordinance. Specifically they claim that the City failed to meet the notice requirements of Tex.Rev.Civ.Stat.Ann. arts. 1011a–1011h, as well as the 14th Amendment of the United States Constitution and Article I, Section 19, of the Texas Constitution. Robert Sloan, City Secretary for the City of Dallas, testified concerning a resolution dated January 14, 1963, which was made a part of the ordinance. The resolution states that hearings were held and notices were given. Charles Pettigrew, a planner with the City's Urban Planning Department for more than 19 years, said he was personally present at most of the public hearings, and he testified that proper legal notices were sent to property owners. This is certainly some evidence that the City complied with the notice and hearing requirements.

The judgment of the court of appeals and the district court granting the permanent injunction is affirmed.

ROBERTSON, J., not sitting.